UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MAURICE GALLION, as Administrator                                                PLAINTIFF
of the Estate of TRACEY GALLION, SR.,
and on behalf of and as natural uncle of
TRACEY GALLION, JR., a minor, and on
behalf of all heirs and wrongful-death
beneficiaries of TRACEY GALLION,
SR., deceased

v.                                              CIVIL ACTION NO.  3:12cv736-DPJ-FKB

HINDS COUNTY, MISSISSIPPI, et al.                                              DEFENDANTS

consolidated with

MAURICE GALLION, as Administrator                                                PLAINTIFF
of the Estate of TRACEY GALLION, SR.,
and on behalf of and as natural uncle of
TRACEY GALLION, JR., a minor, and on
behalf of all heirs and wrongful-death
beneficiaries of TRACEY GALLION,
SR., deceased

v.                                              CIVIL ACTION NO.  3:14cv139-DPJ-FKB

HINDS COUNTY, MISSISSIPPI                                                        DEFENDANT

ORDER

These consolidated civil-rights cases relate to the untimely death of Tracey Gallion, who was a pretrial detainee at a detention center in Hinds County, Mississippi.  The cases are before the Court on Defendant Hinds County, Mississippi's Motion for Summary Judgment [68]; Motion to Strike Plaintiff's Exhibit #72-1, #73-1, Affidavit of Charles Gallion [74]; Motion *in Limine* to Preclude Testimony of Charles Gallion [76]; and Motion to Strike Plaintiff's Exhibit #72-2, #73-2 [78].  As discussed below, the Court finds that Plaintiff has not met the burden of showing that Hinds County acted with deliberate indifference or that it adopted a policy or

custom that was causally connected to Gallion's unfortunate death. Hinds County's motion for summary judgment is therefore granted. The remaining motions are denied as moot.

I.      Facts and Procedural History

Plaintiff's decedent, Tracey Gallion, Sr., was booked into the Hinds County Detention Facility ("HCDF") in Raymond, Mississippi, on March 10, 2012. The jail intake form listed, under Medical Needs, only that Gallion "states he has vericos [sic] veines [sic] lower left leg." Inmate Records [68-3] at 15. A health-screening form completed upon his intake indicated that Gallion disclosed that he was not then taking any medications and had no medical issues at that time. *Id.* at 16.

On March 27, 2012, Gallion submitted a Health Services Request Form, complaining that he "ha[d] a chest cold, nose running and [his] leg want [sic] let [him] sleep." Medical Records [68-4] at 11. The form indicated that Gallion had been suffering from these problems for the duration of his time at HCDF and, when asked to "list all medications you are taking," he wrote, "asthma pump, Lunesta and Allegra for sinuses." *Id.* That document was stamped "received," but neither the form nor Gallion's medical records indicate that any medical professionals at HCDF addressed Gallion's March 27 request. Gallion submitted another Health Services Request Form on April 3, 2012, stating that he was "short of breath and need[ed his] pump." *Id.* at 10. The April 3, 2012 form likewise indicated that Gallion had been suffering from this shortness of breath for the duration of his detention. That form was also stamped "received," but the medical records do not reflect that Gallion received any care until April 5, 2012.

On the evening of April 5, 2012, at approximately 7:08 p.m., two inmates escorted Gallion out of his cell unit and explained that Gallion needed medical attention because he was

having difficulty breathing. Officers on the scene called medical, and at approximately 7:20 p.m., personnel from HCDF medical responded to find Gallion on the floor complaining that he could not breathe. The medical personnel concluded that Gallion "appeared to just be out of breath due to possible hyper-ventilation." Medical Records [68-4] at 4. Medical personnel allowed Gallion to remain in the hallway to catch his breath, at which point he returned to his cell unit. The medical personnel left the cell area at approximately 7:30 p.m.

Just an hour later, at 8:30 p.m., officers called medical for Gallion for the second time. A medical officer arrived at approximately 9:35 p.m. and escorted Gallion to the medical facilities, where he was given a breathing treatment. Following the breathing treatment, Gallion indicated that he felt better, and he was escorted back to his cell unit at around 9:59 p.m. The medical personnel who handled Gallion on the evening of April 5, 2012, put him on a list of inmates to see a medical doctor the following day.[1]

On the morning of April 6, 2012, Dr. Lawrence Sutton saw Gallion for complaints of "no appetite/bronchitis & a cold." Medical Records [68-4] at 6. Dr. Sutton ordered that Gallion be transferred to Central Mississippi Medical Center ("CMMC") for further evaluation. Roughly two hours after arriving at CMMC, Gallion became unresponsive in the emergency room. Gallion was admitted to the hospital ICU with the diagnosis of pulmonary embolism and cardiac arrest. Gallion ultimately developed multi-system organ failure and died on April 23, 2012.

---

[1]The times included in this factual summary come from the log maintained in the control room for the cell pod in which Gallion was housed. Dep. Exs. [73-3] at 88–89. They are not consistent with the incident reports completed by the medical personnel who attended to Gallion on April 5, 2012, which indicated that Gallion spent a "couple of hours" in medical before being returned to his pod. Medical Records [68-4] at 2–5. Viewing the timeline in the light most favorable to Gallion, the Court accepts the times reflected in the log.

Plaintiff Maurice Gallion, acting as Administrator of the Estate of Gallion and on behalf of Tracey Gallion, Jr., and all heirs and wrongful death beneficiaries of Gallion, filed this lawsuit on November 1, 2012.  Plaintiff asserted § 1983 claims for denial and/or delay of medical care against Hinds County, Mississippi, and a slew of Hinds County employees in their individual and official capacities.  The Court granted the individual defendants qualified immunity on February 26, 2014.  In the interim, on October 11, 2013, Plaintiff filed a separate suit against Hinds County asserting both state and federal claims arising out of Gallion's death.  The cases were consolidated, and on September 22, 2014, the Court granted Hinds County's motion to dismiss the state-law and punitive-damages claims.  Thus, the sole remaining claims are federal claims against Hinds County, Mississippi.[2]

II.     Standard of Review

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The

---

[2] The official-capacity claims asserted against the individual defendants are treated as claims against Hinds County.  *See Tuskan v. Jackson Cnty., Miss.*, No. 1:13cv356-HSO-RHW, 2014 WL 3747606, at *1–2 (S.D. Miss. July 29, 2014).

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  Pursuant to Rule 56(c)(1), a party asserting that a fact "is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." "The court has no duty to search the record for material fact issues.  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (citation omitted).  Finally, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) (per curiam).

III.    Analysis

Tracey Gallion's death was a tragic event; he was only 28 years old.  But stating a claim against a municipality under 42 U.S.C. § 1983 requires more than an allegation that its employees acted negligently.  So too, Rule 56(c) requires record evidence supporting the elements of municipal liability.  Plaintiff's claim against Hinds County cannot survive these standards.

A.    Abandoned Claims

Plaintiff's Complaint includes claims based on the Fifth and Eighth Amendments to the United States Constitution as well as a due-process claim for deprivation of property interests.

*See* Compl. [1] ¶ 11. These theories seem infirm for the unrebutted reasons Hinds County states in its motion for summary judgment. They are, therefore, dismissed on the merits and as abandoned. *See Felhaber v. Felhaber*, 702 F.2d 81, 84 (5th Cir. 1983) ("[T]he issue was abandoned by failure to raise it in either of [the] two briefs in response to the motion for summary judgment and by failure to include it in the pretrial stipulation.").

B. Remaining Section 1983 Claims

Plaintiff's sole remaining claims are federal claims against Hinds County for alleged delay in medical care, failure to adopt a medical-emergency policy, and failure to train. The following standards apply to § 1983 claims against municipalities:

> A municipality is not liable under § 1983 on the theory of respondeat superior, but instead only for acts that are directly attributable to it "through some official action or imprimatur." To hold a municipality liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury. The official policy itself must be unconstitutional or, if not, must have been adopted "with deliberate indifference to the known or obvious fact that such constitutional violations would result."

*James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)) (other citations omitted). An official policy includes both a regulation or decision that is officially adopted by the municipality and "[a] persistent, widespread practice of city officials or employees, which . . . is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam). For a common practice to constitute an official policy, "[a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Id.*

1.     Delayed Medical Care

Plaintiff insists that Gallion's "death was at the hands of Hinds County[,] Mississippi[,] and its employees . . . for their failure to provide medical treatment." Pl.'s Resp. [73] at 3.  She then focuses on the acts of individual officers and medical staff, contending that they violated the County's medical policies, resulting in a failure to provide timely and adequate medical care. Pl.'s Resp. [73] at 5.

Based on those employees' alleged failings, Plaintiff asks:  "How is this not deliberate indifference and breach of a policy, practice or procedure?" *Id.*  But Plaintiff poses the wrong question.  Hinds County is not responsible for its employees' acts under a respondeat superior theory.  *See Monell*, 436 U.S. at 691.  To prevail against the County, Plaintiff must point to a policy or custom that was the "moving force" in the alleged violation.  *See James*, 577 F.3d at 617.  And claiming that employees violated the County's officially adopted medical policies does the opposite; it breaks the causal connection between those official policies and the alleged constitutional violation.  *See Jackson v. Ford*, 544 F. App'x 268, 272 (5th Cir. 2013) (per curiam) (affirming summary judgment and holding that county's policy was not "moving force behind the alleged violation of [plaintiff's] constitutional rights" where plaintiff alleged that county officers violated county policy).  Plaintiff has not established municipal liability for this claim.  *See James*, 577 F.3d at 617.

2.     Failure to Adopt Medical-Emergency Policy and/or Train

Plaintiff also faults Hinds County for failing to adopt a medical-emergency policy or better train its officers regarding one.  He claims that "[h]ad such a '*Medical Emergency* policy' existed while Tracey Gallion was incarcerated, his death would have been prevented."  Pl.'s

Resp. [73] at 10. The standards for failure-to-train and failure-to-adopt claims are essentially the same. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003). And as discussed next, Plaintiff's claims fail for lack of evidence showing deliberate indifference or causation.

          a.      Deliberate Indifference

To establish a municipality's deliberate indifference for failing to adopt a policy or train, a plaintiff generally must show "that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). This requires "an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). In other words, "[a] failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir. 1993) (citing *Rhyne*, 973 F.2d at 392); *see also Fleming v. Tunica Cnty. Miss.*, 497 F. App'x 381, 384 (5th Cir. 2012) (per curiam) (same). Finally, to make these showings, "[a] pattern of similar constitutional violations . . . is ordinarily necessary." *Porter*, 659 F.3d 447 (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).[3]

When a plaintiff attempts to show a pattern of conduct, the conduct must be sufficiently similar to prove deliberate indifference. The United States Supreme Court explored this issue in *Connick v. Thompson*, observing that "[w]ithout notice that a course of training is deficient *in a particular respect*, decisionmakers can hardly be said to have deliberately chosen a training

---

[3]Plaintiff has not argued that this case falls within the "narrow range" of cases that might not require proof of a pattern of similar violations. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997). In any event, the exception is inapplicable.

program that will cause violations of constitutional rights." 131 S. Ct. at 1360 (emphasis added). The plaintiff in *Connick* brought § 1983 claims for alleged *Brady* violations and offered proof of four prior *Brady* violations. *Id.* But the Court was unmoved, finding that unlike Thompson's *Brady* claim, none of the prior *Brady* violations "involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* And because those prior violations were dissimilar, "they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation." *Id.*

The evidence in this case is similarly lacking. The closest Plaintiff comes to proof of a pattern is the affidavit of fellow inmate Charles Lavon Gallion.[4] According to Charles Gallion, he "personally witnessed that sometimes the [medical] forms were not picked up on a daily basis and sometimes other incarcerated persons were not treated." C. Gallion Aff. [73-1] ¶ 8. He also states that he was "not given [his] prostate medication timely," *id.* ¶ 9, and that "one would have to fallout before anyone would provide medical attention," *id.* ¶ 10.

These averments are not sufficient. First, evidence related to delayed receipt of medical requests simply proves that the County's policy was ignored. Second, Charles Gallion's account of delayed prostate medication is not sufficiently similar to provide notice to Hinds County that a medical-emergency policy was necessary for the detection of conditions like a pulmonary embolism. *See Connick*, 131 S. Ct. at 1360. And his remaining allegations are too generic to create a jury question. Charles Gallion never identifies any of the other inmates; when the incidents occurred; how many occurred; the inmates' symptoms, injuries, or illnesses; whether their conditions would require emergency care; the duration of their conditions; or the treatment

---

[4]Defendant moved to strike this affidavit, but even considering it, the claim falls short.

they did or did not receive under the existing medical policies that had been adopted just two months before Gallion was incarcerated.

Simply put, there is not enough information to know whether the other inmates' symptoms and conditions were sufficiently similar to have put Hinds County on notice that its existing policies were deficient to detect the type of emergency Gallion presented.  *See Connick*, 131 S. Ct. at 1360.  Without greater specificity, there is no way to tell whether Hinds County made "an intentional choice" not to adopt a medical-emergency policy, with the "obvious" likelihood that the decision would lead to "a deprivation of civil rights."  *Rhyne*, 973 F.2d at 392.

b.     Causation

In addition to deliberate indifference *by Hinds County*, Plaintiff must show that a County policy or custom was the "moving force" behind Gallion's death.  *James*, 577 F.3d at 617.  He attempts to do so by arguing that had a medical-emergency "policy existed while Tracey Gallion was incarcerated, his death would have been prevented."  Pl.'s Resp. [73] at 10.  But as Hinds County notes, this argument has not been factually supported under Rule 56(c).

To begin with, Plaintiff has not stated what such a policy would say, how it might have differed from the policies adopted two months before Gallion died, or how these unidentified provisions would have prevented Gallion's death from a pulmonary embolism.  He merely says the County needed one.  Pl.'s Resp. [73] at 10.  But without knowing what the medical-emergency policy would do or how it was triggered, a jury would be left to speculate as to whether it would have prevented this tragedy.

Plaintiff also fails to establish that Gallion's symptoms would trigger any provisions of the unspecified medical-emergency policy. As noted, Gallion complained that he "ha[d] a chest cold, nose running and [his] leg want [sic] let [him] sleep." Medical Records [68-4] at 11; *see also id.* at 6 (noting final complaints of "no appetite/bronchitis & a cold"). There is no record evidence that these or any of his other symptoms would require emergency care in general or the more specific need to provide Gallion treatment for a yet-to-occur pulmonary embolism.

The issue is similar to the one in *Conner v. Travis County*, where a pretrial detainee experienced a fatal stroke though prison officials knew he suffered another stroke just one month before his incarceration. 209 F.3d 794, 795 (5th Cir. 2000) (per curiam). There, the plaintiffs asserted that the county failed to "train its staff in distinguishing between emergency and non-emergency conditions." *Id.* at 797. The Fifth Circuit affirmed summary judgment noting, among other reasons, that the plaintiffs "did not provide any general evidence about stroke conditions. . . . Nor did they provide detailed evidence about the consequences (aside from the alleged consequences in this case) of not providing immediate treatment when a person exhibits stroke symptoms or misses their daily medication for four or five hours." *Id.*

Here, the only record evidence regarding Gallion's symptoms and the symptoms of a pulmonary embolism come from Defendant's expert medical witness Dr. Thomas D. Fowlkes. Dr. Fowlkes opined—to a reasonable degree of medical certainty—that

> the symptoms of massive pulmonary embolus were not present. Mr. Gallion displayed only nonspecific symptoms and each of the medical personnel appropriately recognized and responded to those nonspecific symptoms. The symptoms which Mr. Gallion had were not indicative of a medical emergency up until the time he collapsed in the ER.

Fowlkes Report [68-7] at 6.  While Plaintiff vehemently rejects these opinions, he offers no countervailing expert testimony or other competent evidence suggesting that Gallion's symptoms required emergency care or were somehow indicative of a pulmonary embolism.

Plaintiff similarly rejects Dr. Fowlkes's opinion that the previously undetected pulmonary embolism broke free after Gallion arrived at the emergency room.  *Id*.  Plaintiff argues:

> Dr. Fowlkes comes to the miraculous conclusion that a large blood clot broke free while in the ER.  *See Defendants' Exhibit 7*.  Such a conclusion flies in the face of the Autopsy and the medical records on file with the Hinds County Detention Center wherein the Tracey Gallion had been complained [sic] of chest pains, trouble breathing and leg pains since incarcerated on March 10, 2012.

Pl.'s Resp. [73] at 4.  While the Court accepts that Gallion had these symptoms while incarcerated, it does not necessarily follow that the pulmonary embolism broke free weeks before he ultimately collapsed in the emergency room.  What Plaintiff offers is akin to a *res ipsa loquitur* argument—Gallion had medical complaints while in prison, so the embolism must have broken free at that time.  But some evidence—probably expert in nature—would be necessary to establish that link.  As it stands, the argument is too speculative to create a jury question.

Based on this record, no reasonable juror could find that Gallion's symptoms would have caused an officer to activate the undefined medical-emergency policy, had one existed.  And as such, Plaintiff has not supported the assertion that a different policy would have saved Gallion's life.  *See RSR Corp.*, 612 F.3d at 857 ("[P]arty opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."); *TIG Ins. Co.*, 276 F.3d at 759 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").

IV.     Conclusion

The Court has considered all of the parties' arguments.  Those not specifically addressed would not have changed the outcome.  For the foregoing reasons, Defendant's Motion for Summary Judgment [68] is GRANTED.  Because the Court was able to resolve the summary-judgment motion even with the evidence Defendant objected to, the Motion to Strike Plaintiff's Exhibit #72-1, #73-1, Affidavit of Charles Gallion [74]; Motion *in Limine* to Preclude Testimony of Charles Gallion [76]; and Motion to Strike Plaintiff's Exhibit #72-2, #73-2 [78] are DENIED AS MOOT.  A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 27th day of May, 2015.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE